1   Shimon Yiftach (SBN 277387)
2   Bronstein Gewirtz & Grossman
    1925 Century Park East, Suite 1990
3   Los Angeles, CA 90067
    T: (424) 322-0322
4   F: (212) 697-7296
    shimony@bgandg.com
5
    Attorneys for Plaintiffs
6
    [Additional counsel appear on signature page]
7

8                  **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**

10  MICHELLE FALK, INDHU JAYAVELU,          )   Case No.:
    PATRICIA L. CRUZ, DANIELLE TROTTER,     )
11  AND AMANDA MACRI, individually and on   )   **CLASS ACTION COMPLAINT FOR:**
    behalf of all others similarly situated, )
12                                           )   (1)  Breach of Express Warranty;
                                             )   (2)  Breach of Implied Warranty of
13                                           )        Merchantability;
                                             )   (3)  Violations of Magnuson-Moss Warranty Act;
14              Plaintiffs,                   )   (4)  Breach of Implied Warranty Pursuant to Song-
                                             )        Beverly Consumer Warranty Act;
15                                           )   (5)  Violations of California's Consumer Legal
                                             )        Remedies Act;
16         v.                                )   (6)  Violations of California's Unfair Competition
                                             )        Law;
17                                           )   (7)  Violations of Ohio's Consumer Sales
                                             )        Practices Act
18  NISSAN NORTH AMERICA, INC.,              )   (8)  Violations of New York's Deceptive Acts and
                                             )        Practices Unlawful;
19              Defendant.                    )   (9)  Violations of Colorado's Consumer Protection
                                             )        Act;
20                                           )   (10) Violations of Illinois' Uniform Deceptive
                                             )        Trade Practices Act;
21                                           )   (11) Violations of Illinois' Consumer Fraud and
                                             )        Deceptive Business Practices Act;
22                                           )   (12) Equitable Injunctive and Declaratory Relief;
                                             )   (13) Relief Pursuant to the Declaratory Judgment
23                                           )        Act; and
                                             )   (14) Unjust Enrichment.
24  _____ )
25                                               **DEMAND FOR JURY TRIAL**
26
27
28

1   **CLASS ACTION COMPLAINT**

2      Plaintiffs Michelle Falk, Indhu Jayavelu, Patricia L. Cruz, Danielle Trotter, and Amanda Macri,

3   individually and on behalf of all others similarly situated, and by and through the undersigned counsel,

4   hereby set forth their claims against Defendant Nissan North America, Inc. in this Consumer Class

5   Action Complaint.

6      **NATURE OF THE CASE**

7      1.      Plaintiffs bring claims under the consumer protection laws of California, Ohio, New

8   York, Colorado, and Illinois, the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, and state

9   warranty law against Defendant Nissan North America, Inc. ("Nissan").

10      2.      This action arises from the sale or lease of more than five hundred thousand vehicles

11   throughout the United States manufactured by Defendant Nissan that are equipped with defective

12   transmissions. These defective transmissions were installed in all Seventh generation (*i.e.*, model year

13   2013 – present) Nissan Sentra automobiles equipped with a continuously variable transmission

14   ("CVT") (the "class vehicles") sold or leased to consumers, including Plaintiffs.

15      3.      Every class vehicle is backed by a New Vehicle Limited Warranty ("Warranty").

16   Nissan's Warranty covers any repairs needed to correct defects in materials or workmanship of

17   covered parts. The basic coverage period lasts 36 months or 36,000 miles, whichever comes first, and

18   the powertrain coverage lasts 60 months or 60,000 miles, whichever comes first. The powertrain

19   coverage specifically applies to the engine, transmission and transaxle, drivetrain, and restraint system.

20   Defendant Nissan explicitly extended the Warranty to all purchasers, lessees, and subsequent

21   purchasers and lessees of class vehicles throughout the United States.  The Warranty assured

22   consumers that Nissan would repair any defect in materials or workmanship under normal use.

23      4.      An implied warranty of merchantability also accompanies the sale of each vehicle and

24   it assures consumers that the vehicles were properly equipped for the use for which they were

25   intended.

26      5.      At the time each class vehicle was sold or leased, Nissan breached its express and

27   implied warranties because each class vehicle was equipped with a dangerous, defective transmission.

28      6.      The transmissions in all of the class vehicles are defective in design, materials, and/or

workmanship. The transmissions cause sudden, unexpected shaking and violent jerking (commonly referred to as "juddering" or "shuddering") when drivers attempt to accelerate class vehicles. The transmissions also hesitate before responding to a drivers' input on the accelerator pedal, which prevents class vehicles from accelerating as intended by the driver, especially from a complete stop. The transmissions also create a hard deceleration or clunk when drivers either slow down or accelerate at low speeds. Owners of class vehicles have reported complete transmission failure in the middle of roadways. This transmission defect creates unreasonably dangerous situations while driving and increases the risk of a crash.

7.     The shuddering, juddering, hesitation, and hard clunk in the transmissions of class vehicles are all caused by a transmission defect.

8.     Plaintiffs Michelle Falk, Indhu Jayavelu, Patricia L. Cruz, Danielle Trotter, and Amanda Macri each requested that Nissan fix the defective transmission of their class vehicles, but Nissan could not or would not repair them.

9.     Nissan sold, leased, and continues to sell and lease the class vehicles despite knowing of the transmission defect and the danger it poses to consumers and other drivers.

10.     Nissan has chosen financial gain at the expense of consumer safety by failing to disclose its knowledge of this critical safety defect to consumers.

11.     Nissan knew or should have known about the safety hazard posed by the defective transmissions before the sale of the class vehicles from pre-market testing, warranty claims, consumer complaints to the National Highway Traffic Safety Administration ("NHTSA"), consumer complaints made directly to Nissan and its dealers, and other sources which drove Nissan to issue Technical Service Bulletins acknowledging the class vehicles' transmissions defect. Nissan should not have sold, leased, or marketed the class vehicles without a full and complete disclosure of the class vehicles' transmission defect, and should have voluntarily recalled the class vehicles long ago.

12.     Plaintiffs bring this action on behalf of themselves and all others similarly situated ("Class," "Class Members," "Subclass Members," "Consumers," "Owners") for Nissan's breach of express and implied warranties under state laws and the Magnuson-Moss Warranty Act, Nissan's deceptive trade practices in violation of the consumer protection laws of California, Ohio, New York,

1  Colorado, and Illinois, and declaratory and equitable relief. Plaintiffs seek damages, injunctive and

2  declaratory relief, restitution, disgorgement of profits, attorneys' fees and costs, punitive damages, and

3  the repair or replacement of class vehicles or refund of money paid to own or lease all class vehicles in

4  the United States.

5  **JURISDICTION AND VENUE**

6      13.    The United States District Court for the Northern District of California has subject

7  matter jurisdiction over this action under the Class Action Fairness Act because at least one member of

8  the proposed class is a citizen of a different state than Nissan, the number of proposed class members

9  exceeds one hundred, and the matter in controversy exceeds the sum or value of $5,000,000.00

10 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

11     14.    The United States District Court for the Northern District of California can exercise

12 general personal jurisdiction over Defendant because Defendant is incorporated in California.

13     15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) - (c). A substantial part

14 of the events or omissions giving rise to the claims occurred in this District.

15     16.    Intradistrict Assignment: Pursuant to Civil L.R. 3-2(c)-(d) and 3-5, this lawsuit is

16 properly assigned to the San Francisco/Oakland Division because San Mateo is the county in which

17 the action arises. In particular, Plaintiff Falk purchased her vehicle in Redwood City, California, which

18 is in San Mateo County.

19  **PARTIES**

20     17.    Plaintiff Michelle Falk, a proposed Class and Subclass representative, is an adult citizen

21 of California residing in San Jose, CA.

22     18.    Plaintiff Indhu Jayavelu, a proposed Class and Subclass representative, is an adult

23 citizen of Ohio.

24     19.    Plaintiff Patricia L. Cruz, a proposed Class and Subclass representative, is an adult

25 citizen of New York.

26     20.    Plaintiff Danielle Trotter, a proposed Class and Subclass representative, is an adult

27 citizen of Colorado.

28     21.    Plaintiff Amanda Macri, a proposed Class and Subclass representative, is an adult

1   citizen of Illinois.

2        22.    Defendant Nissan North America, Inc. is organized under the laws of the State of

3   California and has its principal place of business in Smyrna, Tennessee. Nissan operates, maintains

4   offices, and/or conducts business in all fifty states.

5                     **GENERAL ALLEGATIONS**

6    **A.**  **Nissan Knowingly Sold Dangerously Defective Vehicles to Consumers.**

7        23.    The first class vehicle was sold or leased to members of the Class and Subclass in

8   approximately the fall of 2012.

9        24.    Upon information and belief, Nissan was aware, or should have been aware, of the

10   defect present in class vehicles before it sold the class vehicles. This defect causes the transmission in

11   class vehicles to malfunction and exhibit: hesitation from a stop before acceleration; hard shaking

12   during deceleration; sudden shaking and violent jerking  (commonly known as "juddering" or

13   "shuddering"); and complete failure to function (collectively, "transmission failures").

14        25.    Drivers confirm that the transmission failures occur: when trying to accelerate from a

15   stop; at low speeds when drivers intend to accelerate to merge with highway traffic; and when

16   attempting to drive uphill. The transmission defect creates a serious safety risk that can lead to

17   accidents, injuries, or even death for the driver, the vehicles' occupants, other drivers, and pedestrians.

18        26.    Nissan has a long history of minimizing the significance of the defect by issuing

19   Technical Service Bulletins ("TSBs") and service campaigns through which  it implies that the defect

20   only occurs in certain, seemingly rare, circumstances.

21        27.    Nissan has attributed this problem to the computer software issues or deteriorated

22   transmission fluid; however, Nissan's proposed fixes have not resolved the defect.

23        28.    Within a year of selling the first class vehicle, Nissan acknowledged the transmission

24   failures. *See* Exhibit B (collection of the TSBs summarized in ¶¶ 29-35 herein).

25        29.    Nissan's January 3, 2013 TSB underrepresented the defect by stating that the engines in

26   2013 Sentras would exhibit a small RPM decrease for a short duration or stop running when braking

27   and shifting into reverse or drive. The engines would also exhibit hesitation/lag or stop running

28   entirely when accelerating from a stop. To solve the problem, Nissan recommended that technicians

1  reprogram the Engine Control Module ("ECM") first and, if applicable, the Transmission Control
2  Module ("TCM").

3       30.    The month after that, on March 15, 2013, Nissan continued to minimize the defect by
4  releasing a TSB that documented its Voluntary Service Campaign to reprogram the ECM and, if
5  necessary, the TCM in 2013 Nissan Sentras to prevent a condition in which the vehicle's engine may
6  stop running when first shifting out of park, or at very low speeds (when taking off after a stop or
7  coasting to a stop) in cold weather. Nissan specifically stated, in its TSB, that "*The vehicle still meets
8  and exceeds applicable safety standards and there is no unreasonable risk to motor vehicle safety.*"
9  (emphasis added). On June 27, 2013, Nissan released a Service Campaign Bulletin that reiterated the
10  exact problems and solution identified in the March 15, 2013.

11      31.    Two months later, on May 30, 2013, Nissan noted that the engines in 2013 Sentras
12  continued to display intermittent RPM drops while stopped and recommended reprogramming the
13  ECM if the March 15, 2013 Voluntary Service Campaign set forth in NTB13-022 already "has been
14  completed."

15      32.    By the end of the year, Nissan released another TSB for 2013 Nissan Sentras
16  acknowledging the continued problem of engine RPMs dropping very low while stopped and the
17  engine failing to run altogether while coming to a complete stop. Nissan, again, recommended that
18  technicians reprogram the ECM.

19      33.    By January 27, 2014, Nissan expanded its TSB to include all 2013 and 2014 Nissan
20  Sentras and identified continued problems with the engines' RPMs dropping very low while stopped
21  and failing to run altogether while coming to a complete stop. Nissan, again, recommended that
22  technicians reprogram the ECM.

23      34.    A year later, on August 13, 2015, Nissan conducted another Voluntary Service
24  Campaign to reprogram the CVT in 2013-2014 Nissan Sentras because, according to the TSB, "the
25  belt may slip when manually shifting from the L range to the D range due to low hydraulic pressure.
26  Belt slippage may result in noise, vibration and poor acceleration. Left unrepaired, this condition may
27  reduce the durability of the CVT. *This is not a safety issue, and the vehicle meets or exceeds
28  applicable safety standards.*" (emphasis added). Nissan further stated: "the new software will increase

hydraulic pressure while shifting to prevent CVT belt slip while manually shifting from the L to D range."

35.     On April 7, 2016, Nissan acknowledged that the transmission failures in the CVTs effected the 2015 Sentras as well. Specifically, Nissan stated that 2014-2015 Nissan Sentras were experiencing a judder or shake (pulsing sensation, or fore/aft sensation) while slowing to a stop below 15 mph. Nissan, once again, suggested that technicians reprogram the TCM.

36.     The attempts to "fix" the defect through ECM and TCM reprogramming (the software "updates") or cooling the "transmission oil" ("transmission fluid coolant procedure"), whether performed by Nissan prior to delivery of the class vehicles or performed by a repair technician after delivery, failed to remedy the transmission failures present in all class vehicles.

37.     Upon information and belief, Nissan has yet to develop any solution to correct the transmission defect.

38.     Consumer complaints submitted to NHTSA have persisted despite the application of Nissan's supposed fixes. Some consumers have received three or four computer upgrades and/or fluid replacements, yet continue to experience the dangerous transmission failures. Drivers report that they do not feel safe driving the class vehicles. S*ee* Section B, *infra*; *see also* Exhibit A.

39.     Nissan continued to manufacture, market, and distribute new class vehicles into model year 2017, despite its failure to remedy the known transmission defect.

**B. Consumers Have Extensively Reported the Safety Defect to Nissan.**

40.     NHTSA provides a system for motor vehicle owners to report complaints relating to safety defects that pose a risk of accidents, injuries, and even death in vehicles manufactured or imported in the United States, including safety defects relating to transmission malfunctions. The safety defect complaints are entered into NHTSA's consumer complaint automated database, which manufacturers can access. NHTSA also provides these consumer complaints to the vehicle's manufacturer, including Nissan. Nissan reviews NHTSA consumer complaints. Given that the vast majority of vehicles owners are not aware of NHTSA and/or its reporting system, complaints received by NHTSA are a small minority of the overall number of complaints made to Nissan, which also received complaints directly and/or through their authorized dealerships.

41.     Since at least October 2012, Nissan has received complaints of transmission defects and safety concerns related to the class vehicles through NHTSA, carcomplaints.com, internet forums, and Nissan dealerships, and directly by owners of class vehicles.

42.     Despite Nissan's knowledge of the transmission defect in the class vehicles and its safety implications, Nissan continues to conceal this knowledge by, among other things, issuing TSBs and service campaigns that imply that the defect is insignificant and easily corrected, and has failed to disclose that its class vehicles' transmissions are defective and dangerous. Consumers continue to operate class vehicles and continue to experience dangerous failures of the defective transmission, and are at increased risk for crashes.

43.     Consumers have submitted at least 71 individual NHTSA complaints regarding class vehicles experiencing the transmission defect described in Nissan's Technical Service Bulletins. The number and content of NHTSA consumer complaints of "juddering," "down shifting," "hesitation," and loss of acceleration highlight the class vehicles' transmission defect.

44.     These consumer complaints filed with NHTSA, and delivered to Nissan, often highlight the safety risk caused by the defect, including reports of near accidents and accidents that occurred due to the defect without response or resolution by Nissan. Nissan received and was aware of these consumer complaints. A sample of these complaints are reprinted in the paragraphs below; Plaintiffs have included all of the reported NHTSA complaints in an attachment to this Complaint. S*ee* Exhibit A.

45.     A March 9, 2013 consumer complaint submitted to NHTSA states: "I WAS WAITING AT A RED LIGHT TO MAKE A LEFT TURN. ONCE THE LIGHT TURNED GREEN AND I STEPPED ON THE ACCELERATOR, THE CAR STARTED TO JERK AND LOST POWER. IT DID NOT TURN COMPLETELY OFF BUT IT WOULD NOT DRIVE. I HAD TO PUT MY HAZARD LIGHTS ON TO AVOID BEING REAR ENDED BY THE VEHICLE DIRECTLY BEHIND ME THAT WAS ALSO MAKING A LEFT TURN. I OWNED THE CAR FOR LESS THAN 24 HOURS AT THAT POINT. IT ONLY HAD 152 MILES ON THE ODOMETER. THE DEALERSHIP SENT A TOW. THE DIAGNOSIS WAS THAT THE SOFTWARE NEEDED TO BE UPDATED. I DON'T UNDERSTAND HOW NISSAN CAN SELL A CAR THAT ISN'T

PROPERLY PROGRAMMED? WHY WASN'T THE PROGRAMMING CHECKED PRIOR TO ME DRIVING IT OFF THE LOT? I WILL DRIVE IT FOR A FEW DAYS TO SEE IF IT HAPPENS AGAIN. *TR"

46.     A March 1, 2015 consumer complaint submitted to NHTSA states: "AS I WAS DRIVING MY CAR BEGAN TO JERK. I COULD NOT GAIN ANY SPEED AND ALMOST CAUSE TWO ACCIDENTS BECAUSE OF THE WAY IT JERKED. *TR"

47.     A November 11, 2015 consumer complaint to NHTSA states: "THIS HAPPENED ON THE FREEWAY, TRANSMISSION SLAMMED INTO LOW GEAR GOING AT 65 MPH. PULLED OFF THE FREEWAY AND LUCKILY DUARTE NISSAN IN CALIFORNIA WAS LESS THEN A MILE AWAY. THE CAR BARELY MADE IT. THEY REPLACED THE TRANSMISSION BUT THIS WAS AT ONLY 20K MILES. THE DEALERSHIP SAID THAT THIS IS HAPPENING TO A FEW VEHICLES, BUT THIS IS DANGEROUS THAT MY CAR SLAMMED INTO LOW GEAR ON THE FREEWAY. IT SCARED MYSELF AND MY FAMILY."

48.     A June 7, 2016 consumer complaint submitted to NHTSA states: "OUR SENTRA HAS A CVT. IT CURRENTLY HAS LESS THAN 7,500 MILES ON THE ODOMETER. ON THREE (3) OCCASIONS, THE TRANSMISSION HAS FAILED TO UPSHIFT AS WE MOVED AWAY FROM A STOP AT A TRAFFIC LIGHT. AT 30 MPH OR LESS, THE TACH IS AT 4,000 RPM. WE HAVE TO FIND A SAFE PLACE TO PULL THE VEHICLE TO THE SIDE OF THE ROAD, PUT THE TRANS SELECTION LEVER IN PARK AND THEN RESTART OUR JOURNEY. WE HAVE TAKEN THE VEHICLE TO THE NISSAN DEALER WHO TOLD US THAT THERE WAS NO PROBLEM......NO COMPUTER ERROR OR MALFUNCTION. WE CONTACTED NISSAN USA AND WERE TOLD THE SAME THING. THE TRANSMISSION OF THE COMPUTER CONTROLLING IT HAS A PROBLEM. DATES OF PROBLEMS: 3/20/2016; 5/20/2016; 5/25/2016"

49.     An October 8, 2016 consumer complaint submitted to NHTSA states: ""MT VEHICLE SINCE I BOUGHT IT WITH ONLY 3 MILES HAS WHEN COMING TO A STOP START TO SHAKE VIGOROUSLY BROUGHT IT TO THE ATTENTION WHEN I HAD MY AC COMPRESSOR REPLACED AT ONLY 50,000 MILES , MIND YOU I DO DRIVE MY VEHICLE

ALOT 125 MILES A DAY AND ITS ALL HIGHWAY BUT I ALSO MAINTAIN IT REGULARLY// THE VEHICLE GOING AT 65 MILES PER HOUR THE OTHER DAY STARTED TO HESITATE AND RPMS STARTED TO JUMP HIGHER AND LOSE POWER ON A MAIN HIGHWAY DURING THE AFTERNOON IN SAN ANTONIO WHERE TRAFFIC IS BAD I HAD MY LITTLE GIRL AND THAT LOSS OF ACCELERATION AND JUMP /CLUNK ALMOST CAUSED ME TO GET REAR ENDED BY A 18 WHEELER WHICH HONKED AT ME AND SCARED MY LITTLE GIRL// AFTER RESEARCH ON THIS MAKE AND MODEL I HAVE FOUND THAT THERE HAS BEEN NUMEROUS COMPLAINTS IN THE SAME REGARD SAME ISSUE RISKING LIFE AND SAFETY DUE TO A FAULT THAT NISSAN KNOWS ABOUT DUE TO RECALL THEY SET FOR 03 - 10 YEARS AND MODELS USING THE CVT TRANSMISSION NOW MY VEHICLE IS A 2014 AND AFTER RESEARCH SEE THAT MANY CONSUMERS ARE PUT IN THE SAME DANGEROUS SITUATION AND HAVE COMPLAINED ONLY FOR IT TO FALL ON DEAF EARS. I AM NOW SCARED TO DRIVE A VEHILCE THAT I STILL OWE ON DUE TO HAVING MY 4 YEAR OLD IN WITH ME"

50.     An April 25, 2017 consumer complaint submitted to NHTSA states: "TAKATA RECALL. THE TRANSMISSION HAS GONE OUT ON ME THREE TIMES SINCE DECEMBER 30, 2016. THE MOST RECENT AS OF 04/03/2017. I ALMOST GOT KILLED EACH TIME ON THE FREEWAY. I WOULD BE GOING 65 MPH IN THE MIDDLE OF THE FREEWAY AND IT WOULD DROP TO 45MPH AND EVENTUALLY COULD NOT FUNCTION. NISSAN JUST REPLACES THE TRANSMISSION BUT THEY KEEP BREAKING. THEREFORE THEY KEEP FAILING AT FIXING THE PROBLEM WITHIN MY VEHICLE AND PUT MY LIFE ON THE LINE. IT IS CONSIDERED A LEMON AND THEY AGREED WHICH IS WHY THEY GAVE ME THE OPTION FOR THEM TO BUY THE VEHICLE BACK FROM ME OR EXCHANGE IT. I CHOSE FOR THEM TO GIVE ME MY REFUND. I WANT A RECALL ON THIS VEHICLE AND OTHERS LIKE IT BECAUSE THEY RISKED MY LIFE MORE THAN ONCE AND THAT SHOULD NOT HAPPEN TO ANYONE. THEY'RE ARE FAMILIES IN THESE VEHICLES AND THEY'RE LIVES SHOULD NOT BE AT STAKE LIKE THIS. I RESEARCHED THAT I AM NOT THE ONLY ONE WHO HAS SUFFERED WITH THIS SITUATION WITH THE SAME MAKE AS

MY CAR. I HAVE INVOICES THAT I CAN PROVIDE IF NEEDED. PLEASE TAKE ACTION ON THIS. THANK YOU."

51.     A May 10, 2017 consumer complaint submitted to NHTSA states: "WHILE DRIVING 50-60 MPH, THE CAR SLIPPED INTO NEUTRAL AND WOULD NOT ACCELERATE. I WAS ABLE TO GET TO THE SIDE OF THE ROAD SAFELY HOWEVER, IT REQUIRED ME TO PUT IT IN PARK AND THEN SHIFT BACK TO DRIVE IN ORDER TO GO. THE DEALER INDICATED ITS A CVT ISSUE, WHICH MAY BE SUFFERING FROM A "CVT BELT SLIP CONDITION," WHICH IS THE FAILURE OF THE CHAIN DRIVE TO TRANSFER POWER THROUGH THE TRANSMISSION AND ACCELERATE THE VEHICLE.THE DEALER REPLACED THE TRANSMISSION (UNDER WARRANTY) AND THE PROBLEM IS STILL OCCURRING. THE DEALER NOW HAS THE CAR TO DISCUSS WITH NISSAN THE NEXT STEPS."

## C. Nissan Has Long-Known That Its CVT-Equipped Vehicles Suffer From Transmission Defects Similar To The Defect In The Class Vehicles.

52.     Nissan has been on notice for years that its CVT-equipped vehicles suffer from transmission defects.  For example, Nissan doubled the warranty period for the transmission in various models of 2003 to 2010 Nissans equipped with a CVT to pacify consumers' concerns that the CVTs were defective and would eventually fail, leading to repair costs after the warranty expired. Nissan's warranty extension covered the 2007-2010 Sentras. *See*, Exhibit C.

53.     Nissan also recently settled a class action wherein the plaintiffs alleged that the CVT in Nissan Pathfinder vehicles had a similar defect to that which Plaintiffs allege for the Sentra class vehicles.  *See Batista v. Nissan N. Am., Inc.*, Case No. 14-24728 (S.D. Fla.).

54.     Nissan has also released TSBs regarding CVT issues for earlier Sentra models and other model Nissan vehicles. *See*, Exhibit D (collection of the TSBs summarized in ¶ 54 herein). For example:

    a.   On August 15, 2014, Nissan released a TSB acknowledging that the CVT reduced vehicle speed in 2007-2012 Nissan Sentras after high driving speed, driving in ambient temperature of 96 degrees of higher, climbing steep or extended hills for 6

miles or more, and whine or rattle type noises due to reduced engine performance at decreasing vehicle speeds. Nissan recommended that its technicians install a kit designed to cool "transmission oil". Nissan released another TSB acknowledging the same problems and fixes on November 25, 2015, which indicates that Nissan had not solved the problem.

b.   Nissan released a TSB on April 6, 2016 directed toward the 2013-2016 Altima and the 2014-2016 Rogue to correct the vehicles' hesitation and loss of power. The recommended fix included removing the control valve to inspect the CVT belt to assess evidence of CVT belt slippage. If there was no such evidence, the technician was told to replace the control valve and effectively do nothing. If evidence of belt slippage existed, Nissan replaced the entire CVT assembly.

c.   A September 10, 2013 TSB released by Nissan noted a pronounced juddering during light acceleration between 5 and 35 mph in 2013-2014 Nissan Altima V6 Sedans and 2013-2014 Pathfinders. To fix the issue, Nissan recommended reprogramming the CVT unless the vehicle was a Pathfinder built before December 2012. In that case, unless a January 10, 2013 voluntary service campaign to reprogram the Pathfinder was performed, Nissan required the complete replacement of the CVT. Even 2013-2014 Pathfinders and Altimas manufactured after December 2012 had the CVTs completely replaced if reprogramming of the CVT once again failed and the vehicle exhibited pressure vibration.

d.   Nissan recognized long-standing issues with the CVT in reducing engine performance and creating conditions where the vehicle experiences low power in July 6, 2012. Nissan identified the applicable vehicles as the 2001-2011 Altimas, 2008-2011 Altima Coupes, 2007-2011 Sentras, and 2008-2011 Rogues. At that time, Nissan advised technicians to look for overfilled CVT fluid levels, incorrect types of transmission fluid, or incorrect coolant/water mixes, but otherwise failed to offer any other repairs.

55.   Nissan has continuously experienced problems over a number of years with its CVTs

that result in the same transmission failures that Plaintiffs have experienced. Yet, Nissan has continued to install the CVT transmissions in its vehicles and failed to adequately disclose to Plaintiffs, the Class, or the Subclasses the resulting transmission failures or the safety implications of such failures.

**D.  Nissan Did Not Disclose the Safety Defect to Plaintiffs, the Class, or Subclass Members.**

56.    Despite Nissan's knowledge of the defect present in class vehicles, Nissan continued to fail to disclose this unresolved safety defect to new and subsequent purchasers and lessees of class vehicles. Nissan continues to manufacture and sell Nissan Sentras equipped with the defective transmissions without any disclosure to consumers about these hidden safety defects. Nissan otherwise prevents reasonable consumers from repairing or discovering this hazard until the vehicle's transmission unexpectedly fails to properly function, placing its occupants and other travelers in danger.

57.    Nissan's Technical Service Bulletins concerning the transmission problems in class vehicles were not directly sent to purchasers directly and did not fully disclose the pervasiveness of the defect, the safety issues arising from the defect, or the uncertain nature of the prescribed fixes.

58.    Plaintiffs, the Class, and Subclass Members would not have purchased or leased their vehicles, or would have paid significantly less for them, had they known of the transmission defect and the safety hazard it creates. By failing to disclose the defect, Nissan denied Plaintiffs, Class Members, and Subclass Members information that was material to their purchase or lease and material to their willingness to use their class vehicles.

**E.  Nissan's Warranties Cover the Transmission Defect, but Nissan has Refused to Correct the Defect.**

59.    For each class vehicle sold by Nissan, an express written warranty was issued which covered the vehicle, including but not limited to, the transmission system.

60.    Nissan provided all purchasers and lessees of the class vehicles with a New Vehicle Limited Warranty ("Warranty"). Nissan's Warranty covers any repairs needed to correct defects in materials or workmanship of covered parts. The basic coverage period lasts 36 months or 36,000 miles, whichever comes first, and the powertrain coverage lasts 60 months or 60,000 miles, whichever comes first. The Warranty begins on the date the vehicle is delivered to the first retail buyer or put into

use, whichever is earliest. The powertrain coverage specifically applies to the engine, transmission and transaxle, drivetrain, and restraint system.  Defendant Nissan explicitly extended these warranties to all purchasers, lessees, and subsequent purchasers and lessees of class vehicles throughout the United States.

61.     Furthermore, under the powertrain coverage, Nissan expressly warranted that it "covers any repairs needed to correct defects in materials or workmanship" to the powertrain components, which include the engine and the transmission.

62.     Nissan also sold or leased the class vehicles to the Plaintiffs, Class, and Subclass Members under an implied warranty of merchantability. Nissan's express warranty confirms that Nissan offers implied warranties, including the implied warranty of merchantability, for the same duration as the express warranty. Nissan impliedly warranted that the class vehicles were merchantable in that they were in a safe and non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended, and were not otherwise injurious. Nissan is under a duty to design, construct, manufacture, inspect, and test the class vehicles so as to make them suitable for the ordinary purposes of their use— safe and reliable transportation.

63.     Nissan breached its warranties for the class vehicles when it: designed, manufactured, and sold class vehicles with defects in the transmission system, refused to recognize or repair the defect in the transmission when confronted with the transmission failures, and/or otherwise inadequately repaired the defect through ineffective software updates, transmission fluid flushes, or replacement of the defective transmissions with equally defective transmissions. In breach of Nissan's warranties, the class vehicles are defective, unsafe, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

## PLAINTIFFS' ALLEGATIONS

64.     Like all new or certified pre-owned Nissan vehicles, Plaintiffs' class vehicles each came with Nissan's Warranty. This Warranty was a material factor in Plaintiffs' decisions to purchase their respective class vehicles.

65.     At the time of Plaintiffs' purchases, Nissan failed to disclose, concealed, and/or omitted consumer complaints, malfunctions, safety hazards, and material facts related to the class vehicles'

defective transmission.

66.     Before Plaintiffs purchased their respective class vehicles, Plaintiffs were never informed of, or aware of, the Nissan Sentra's transmission failures. Plaintiffs were also unaware of Nissan's prior failed attempts to address the class vehicles' defect.

67.     Had Nissan disclosed the defect, Plaintiffs would not have purchased the class vehicle or would have paid significantly less for it. Plaintiffs were denied information material to their purchases and willingness to use the class vehicle. To the contrary, Plaintiffs relied upon Nissan's express and implied warranties that the class vehicles were fit and safe for its ordinary purpose, merchantable, and free of irreparable defects.

68.     Plaintiffs used the class vehicles in a reasonable manner and followed all scheduled maintenance recommendations.

A.  **Plaintiff Michelle Falk Purchased A 2015 Nissan Sentra With The Undisclosed Safety Defect.**

69.     On or about July 21, 2016, Plaintiff Michelle Falk purchased a used 2015 Nissan Sentra from Enterprise Car Sales in Redwood City, California for $14,000. The original purchaser of Plaintiff Falk's vehicle purchased it on or about January 19, 2015. At the time of Plaintiff's purchase, the odometer of the class vehicle recorded 38,332 miles.

70.     In August 2016, within a few weeks of her purchase, Plaintiff Falk noticed that, when shifting from park to drive, the engine would feel like it was failing and she would hear a big clanking noise. Within a day or so after that, there was a loss of power when driving from a stop and then, shortly after that, her vehicle would take a long time to speed up to 30 mph.  In fact, there was so much lag that Plaintiff Falk felt like she was driving with the emergency brake engaged. When going over 45 mph, her car would shake violently, which caused her immediate concern. The car would lose power and decrease speed on the freeway and almost die at stop signs. When starting from a complete stop, the car displayed significant hesitation and drove like it had a manual transmission. Plaintiff Falk feared driving the vehicle because she had no confidence that the car had sufficient speed or power to merge and because its performance was unpredictable. On August 15, 2016, the engine light came on and she scheduled an appointment at an authorized Nissan dealership.

71.     At her first visit to Premier Nissan of San Jose ("Premier Nissan") in San Jose, California, on August 23, 2016 at 39,121 miles. The dealership's service department told her that "these things happen with CVT transmissions" and that they would check it. According to Plaintiff Falk's service records, Nissan technicians verified her concerns and found a TSB related to the issue. The technicians cleaned the inside of the throttle chamber and updated the ECM software.  However, this service did not correct the defect and the same problems with lagging and lack of power upon acceleration soon recurred.

72.     Plaintiff Falk took her car back to Premier Nissan on September 16, 2016 at 39,930 miles. Plaintiff Falk informed the technicians that the class vehicle jerked when accelerating and when putting into gear from park. She went on a test drive with the service technician, who noticed the problems immediately and also noted that the vehicle hesitated. The technician said that "Nissan was notorious for problems with CVT. They get cars that need replacing all the time." When Ms. Falk asked why Nissan continues to manufacture cars equipped with CVTs, the technician said that "it was trial and error. These cars needed to be driven very carefully, anything could mess it up."  The dealership kept Plaintiff Falk's Sentra for almost two weeks. According to her service records, the technician observed Ms. Falk's concerns that the vehicle jerks upon acceleration and when put into gear from park, as well as hesitation in the vehicle. The technicians did not find any stored codes or applicable service bulletins. They recommended dropping the transmission oil pan and looking for internal damage to the CVT assembly. Upon removing the oil pan, the technician found that the transmission fluid was almost back and displayed a burnt odor. Based on the burnt fluid and jerking of the vehicle, the technician replaced the CVT Transaxle Assembly. Even this did not correct the defect in Ms. Falk's class vehicle.

73.     Ms. Falk took the car in for service again to Premier Nissan on October 10, 2016 at 40,100 miles for the same problems. According to service records, she informed Nissan that the vehicle resists and shudders at 30 mph when driving and accelerating. The Nissan dealership told her that this is just the way the CVT works. She asked them to check it again, as she did not feel comfortable driving the vehicle, and they represented to her that everything was fine.

74.     Everything was not fine. On May 1, 2017 at 49,491 miles, Ms. Falk tried to merge onto

the freeway, but her vehicle would not achieve a speed of over 20 mph. She also informed Premier Nissan about a clunking noise that she heard when shifting into drive from park. Additionally, Ms. Falk confirmed that the same problems from her October 10, 2016 visit persisted. The technicians verified the clunking noise that occurs in Ms. Falk's vehicle when shifting out of park. The technician determined that TSB 12-055e applied to Ms. Falk's vehicle and applied grease to the bearing surfaces of the vehicle on both sides.

75.    The same problems continued. Ms. Falk again brought her vehicle to Premier Nissan on May 27, 2017 at 50,715 miles. She informed the technicians that the vehicle felt like it was going to stall on the freeway and that she continued to hear clunking noises when shifting from park to drive and, additionally, when shifting to reverse the vehicle. The dealership could not replicate any of Plaintiff Falk's issues and performed no fix.

76.    On June 6, 2017 at 51,131 miles, Plaintiff Falk went back to Premier Nissan and represented that she was experiencing all of the same issues that occurred on her prior visits. Again, Nissan could not replicate the issues and did not perform a fix.

77.    Despite providing Nissan and its authorized dealer with ample opportunity to repair her vehicle, Plaintiff Falk continues to experience the transmission failures.

**B.  Plaintiff Indhu Jayavelu Purchased A 2016 Nissan Sentra With The Undisclosed Safety Defect.**

78.    On or about November 25, 2016, Plaintiff Jayavelu purchased a new 2016 Nissan Sentra from Fred Martin Nissan in Akron, Ohio for $17,700.

79.    Almost immediately after her purchase, Plaintiff Jayavelu's class vehicle began to judder and would fail to properly accelerate. On November 25, 2016 at 720 miles, Plaintiff Jayavelu sought an inspection of the class vehicle at Airport Nissan of Cleveland in Cleveland, Ohio. She represented that she felt a vibration through the steering wheel when braking to a stop and when driving about 20-25 mph. The service technician's notes indicate that Nissan could not replicate her concern and made no repair.

80.    Plaintiff Jayavelu again brought her vehicle in for repair at 829 miles on December 19, 2016. She brought the vehicle to Nissan of North Olmsted, LLC in North Olmsted, Ohio. She stated

1   that she felt vibration and her vehicle would not accelerate properly when her vehicle was accelerating
2   from 20-40 mph and when slowing down to a stop. The technicians test drove the vehicle and agreed
3   that the vehicle vibrated. Because the technician could not find a code, however, Nissan did nothing to
4   fix the vehicle and advised Ms. Jayavelu to call Nissan Customer Affairs.

5        81.   Ms. Jayavelu called Nissan Customer Affairs, but the representative said that Nissan
6   could not help her because the dealership did not find any stored codes in her vehicle.

7        82.   Despite providing Nissan and its authorized dealer with more than one opportunity to
8   repair her vehicle, Plaintiff Jayavelu continues to experience the transmission failure.

9   **C. Plaintiff Patricia L. Cruz Purchased A 2014 NISSAN Sentra With The Undisclosed**
10  **Safety Defect.**

11       83.   On February 14, 2015, Plaintiff Cruz purchased a new 2014 Nissan Sentra from Nissan
12  112 in Patchogue, New York for about $18,000. Ms. Cruz also purchased an extended warranty for
13  $2,000.

14       84.   Soon after purchasing the vehicle, Plaintiff Cruz noticed symptoms of the defect,
15  including frequent juddering, a whining noise, and delayed acceleration.

16       85.   On August 10, 2016, Plaintiff Cruz took her vehicle to Nissan 112 in Patchogue, New
17  York at 16,465 miles. She informed the technician that there is a whistling noise and that her vehicle
18  would "pull back" at around 25-40 mph. The service records indicate that the technician road tested
19  the vehicle and could not replicate the problem or find codes in the computer. Nissan did not perform
20  any repairs.

21       86.   On October 10, 2016, Plaintiff Cruz took her vehicle back to Nissan 112 at 18,006
22  miles and indicated that she heard a noise in the transmission. The technician noted in the service
23  records that the car had a noise in the transmission and indicated that (s)he reprogrammed the
24  transmission.  However, the technician informed her that nothing could be done without a diagnostic
25  code.

26       87.   Plaintiff Cruz called Nissan on November 11, 2016 to discuss the technicians' failure to
27  perform a repair. A Nissan representative named "Andrea" informed Ms. Cruz that Nissan could not
28  help unless the technician found a repair code.

88.     The problems continued and Plaintiff Cruz brought her vehicle back to Nissan 112 on January 4, 2017 at 20,570 miles. She informed the technician that the transmission was exhibiting a kick back when approaching 40 mph. The technician test drove the vehicle and felt the sudden shaking and noted that he had driven other Sentra's and observed the same sudden shaking. Plaintiff Cruz also stated that she experienced the same defect in the 2016 Nissan Sentra loaner car provided to her. The technician concluded that the vehicle was operating as designed and did not warrant a repair.

89.     Despite providing Nissan and its authorized dealer with several opportunities to repair her vehicle, Plaintiff continues to experience the transmission failure.

**D.  Plaintiff Danielle Trotter Purchased A 2013 Nissan Sentra With The Undisclosed Safety Defect.**

90.     In April 2013, Plaintiff Trotter purchased a new 2013 Nissan Sentra for $27,133.20 from South Colorado Springs Nissan in Colorado Springs, Colorado.

91.     Within the first month of her purchase, at approximately 333 miles, Plaintiff Trotter noticed the transmission failures, including that the vehicle nearly stalled at stoplights, vibrated and jerked under acceleration, had severe lag, would not go more than 20 mph without shaking and exhibited severe juddering at higher speeds.

92.     Plaintiff Trotter took her vehicle to South Colorado Springs Nissan in June 2013 at 333 miles. She told the technician that the vehicle idles roughly at a stop light and she can feel the vibration through the steering wheel. According to the service records, the technician confirmed a problem with the RPMs at idle and performed the March 15, 2013 TSB to her vehicle. Plaintiff Trotter disputes that the technician repaired the vehicle. Instead, Plaintiff Trotter maintains that the technician informed her that her vehicle's computer was recalled and that they needed to update the software. The technician then told her that South Colorado Springs Nissan's computers were down, but that the car was safe to drive in the meantime. The technician did not tell Ms. Trotter that there was anything wrong with the transmission.

93.     In March 2017 at 113,462 miles, Plaintiff Trotter took her vehicle to Woodmen Nissan in Colorado Springs, Colorado and informed the technicians that the vehicle would not go over 20 mph. During the test drive, the technician could not duplicate Plaintiff Trotter's concern and, therefore

did not proceed with a transmission fix.

94.    In May 2017, Plaintiff Trotter again brought her vehicle to Woodmen Nissan because the vehicle had no power when coming off the highway and when trying to leave a stop light. Ms. Trotter also stated that the vehicle would shake and judder when coming off the freeway. When the technicians test drove the vehicle, they felt a shudder but did not find any diagnostic codes. The technicians diagnosed the issue as a potential internal CVT transmission issue and recommended that Plaintiff Trotter replace her transmission for $3900. Plaintiff declined to replace the transmission, but the technicians nonetheless charged her $122 for the labor involved in the diagnosis.

95.    Despite providing Nissan and its authorized dealer with more than one opportunity to repair her vehicle, Plaintiff Trotter continues to experience the transmission failure.

E.    **Plaintiff Amanda Macri Purchased A 2013 Nissan Sentra With The Undisclosed Safety Defect.**

96.    In December 2013, Plaintiff Amanda Macri purchased a new 2013 Nissan Sentra from Glendale Nissan in Glendale Heights, Illinois for $23,000.

97.    During the period January to May 2016, Plaintiff Macri first noticed that the RPMs were fluttering on the highway, even on cruise control, and when driving up and down hills. The vehicle shook when at a stop and hesitated when accelerating from a stop.

98.    In July 2016, Plaintiff Macri took the vehicle to Nissan of St. Charles in St. Charles, Illinois at 42,125 miles and informed the service department that the vehicle was shaking when it accelerated and jerking when coming to a complete stop. The service records indicate that the technician could not replicate the defect and did nothing to fix the vehicle because no codes appeared in the computer.

99.    Plaintiff Macri again brought the vehicle to Nissan of St. Charles in February 2017 at 54,594 miles and stated that, at 60 mph, the RPMs were bouncing between 1000-3000, particularly while on cruise control driving uphill. The service notes indicate that the technician could not replicate the problem and refused to perform any repairs.

100.    In March 2017, Plaintiff Macri called Nissan and spoke with a regional specialist. The specialist said that, if the dealer cannot replicate the issue, Nissan could not help her.

1    101.   In April 2017 at 56,817 miles, Plaintiff Macri brought her vehicle to Wickstrom

2    Chevrolet in Roselle, Illinois because the transmission began to sputter randomly at higher speeds. The

3    technician at Wickstrom Chevrolet is a family friend of Plaintiff and she trusted him to diagnose the

4    failures in the vehicle where Nissan repeatedly failed to do so. The technician identified the issues that

5    Plaintiff Macri experienced and recommended that Nissan perform a fluid flush and replace the spark

6    plugs. At that point, Plaintiffs' authorized Nissan dealership – Nissan of St. Charles – had been so

7    hostile to her that she did not feel comfortable turning to them for that particular fix, especially

8    because they denied that a problem existed every time she took the vehicle in for repair.

9    102.   Despite providing Nissan and its authorized dealer with multiple opportunities to repair

10   her vehicle, Plaintiff Macri continues to experience the transmission failure.

11                                    **CLASS DEFINITION**

12   103.   Pursuant to Rules 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure,

13   Plaintiffs will seek certification of a nationwide Class defined as follows:

14   All persons who purchased and/or leased in the United States a model year 2013-2017 Nissan

15   Sentra equipped with a CVT.

16   104.   Plaintiffs also seek certification of Subclasses defined as follows:

17   A California Subclass consisting of:

18   All persons who purchased and/or leased in Californian a model year 2013-2017

19   Nissan Sentra equipped with a CVT.

20   An Ohio Subclass consisting of:

21   All persons who purchased and/or leased in Ohio a model year 2013-2017

22   Nissan Sentra equipped with a CVT.

23   A  New York Subclass consisting of:

24   All persons who purchased and/or leased in New York a model year 2013-2017

25   Nissan Sentra equipped with a CVT.

26   A Colorado Subclass consisting of:

27   All persons who purchased and/or leased in Colorado a model year 2013-2017 Nissan Sentra

28          equipped with a CVT.

An Illinois Subclass consisting of:

All persons who purchased and/or leased in Illinois a model year 2013-2017 Nissan Sentra equipped with a CVT.

105.    The Class and Subclass definitions specifically exclude: (a) all persons who assert personal injury or property damage claims arising from or relating to the transmission failures in their class vehicle; (b) all persons who have had their class vehicle re-purchased or "bought back" by Defendant Nissan (whether the buy-back was required by law or was solely pursuant to agreement); (c) any persons or other entity currently related to or affiliated with Defendant; (d) any person, firm, trust, corporation, or other entity who purchased for resale, from Defendant, or any entity related to or affiliated with Nissan, a model year 2013-2017 Sentra, (e) any Judge presiding over this action and members of his or her family; and (f) all persons who properly execute and file a timely request for exclusion from the Class.

## CLASS ALLEGATIONS

106.    *Numerosity*: the Class and Subclasses are comprised of thousands of Nissan Sentra owners throughout the United States, making joinder impractical. Moreover, the Class and Subclasses are composed of an easily ascertainable, self-identifying set of individuals and entities who purchased 2013-2017 Nissan Sentras. The Members of the Class and Subclasses are so numerous that joinder of all members is impracticable. The precise number of Class and Subclass Members can only be ascertained through discovery, which includes Defendants' sales, service, and complaint records. The disposition of their claims through a class action will benefit both the parties and this Court.

107.    *Commonality*: The critical questions of law and fact common to the Class and Subclasses that will materially advance the litigation include, but are not limited to, the following:

a.    Whether the transmission installed by Defendants in the class vehicles, model years 2013-2017 are defective;

b.    Whether Defendants knew about the defective transmissions in class vehicles when they sold the class vehicles;

c.    Whether the transmission defect constitutes a breach of the implied warranty of merchantability, including a violation of the Song-Beverly Consumer Warranty Act;

d.   Whether refusing or failing to repair the transmission defect constitutes a breach of the express warranty;

e.   Whether the Defendants' concealment of and/or failure to disclose the defect in class vehicles constitutes unfair or deceptive acts or practices in violation of state consumer protection statutes;

f.   Whether information about the defect was material to a reasonable consumer in making a decision to purchase, lease, or use class vehicles;

g.   Whether Nissan's inability to fix the transmission defect in class vehicles means that Nissan's express warranty has failed its essential purpose;

h.   Whether Members of the Class and Subclasses are entitled to be notified and warned about the transmission defect and are entitled to the entry of final and injunctive relief compelling Defendant to issue a notification and warning to all Class and Subclass Members concerning such a defect;

i.   Whether Defendant deliberately misrepresented or failed to disclose or concealed material facts to Plaintiffs and the Class and Subclass Members;

j.   Whether Nissan acted or refused to act on grounds generally applicable to the Class, thereby making the award of equitable relief and/or restitution appropriate to the Class as a whole;

k.   Whether Plaintiff and Class Members would have purchased their class vehicles, or whether they would have paid a lower price for them, had they known of the transmission failures;

l.   Whether Plaintiffs and Class and Subclass Members are entitled to actual damages;

m.   Whether Plaintiffs and the Class and Subclasses are entitled to restitution and/or disgorgement;

108.   *Typicality*: The Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendant's conduct in designing, manufacturing, warranting, and selling the class vehicles with the same transmission defect.

109.   *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of

the Class Members and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breach of warranties, product liability, and product design defects.

110.    *Predominance*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members.

111.    *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Because the damages suffered by each Class and Subclass Member are relatively small compared to the expense and burden of prosecuting this compelling case against a well-financed, multibillion dollar corporation, this class action is the only way each Class and Subclass Member can redress the harm that Nissan caused.

## TOLLING OF STATUTES OF LIMITATIONS

112.    Discovery Rule. Plaintiffs' claims accrued upon discovery that the transmission system that Nissan designed, manufactured, and installed into the class vehicles suffered from transmission failures, and that the transmission failures could not be repaired. While Nissan knew, and omitted, the fact that the transmissions suffer from a defect that causes failures, Plaintiffs, Class Members, and Subclass Members could not and did not discover this fact through reasonable diligent investigation until after they experienced failures, reasonably excluded other potential causes of the failures, and learned that warranty "repairs" by Nissan did not solve the problem.

113.   Active Concealment Tolling. Any statutes of limitations are tolled by Nissan's knowing and active concealment of the fact that the transmission suffered from a defect. Nissan kept Plaintiffs and all Class and Subclass Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiffs. The details of Nissan's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class and Subclass Members. Plaintiffs could not reasonably have discovered the fact that the transmissions suffered from a defect that would cause repeated and significant failures.

114.   Estoppel. Nissan was and is under a continuous duty to disclose to Plaintiffs, as well as Class and Subclass Members, the true character, quality, and nature of the transmissions. At all relevant times, and continuing to this day, Nissan knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the transmissions. The details of Nissan's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class and Subclass Members. Plaintiffs and Class and Subclass Members reasonably relied upon Nissan's knowing and/or active omissions. Based on the foregoing, Nissan is estopped from relying upon any statutes of limitation in defense of this action.

115.   Equitable Tolling. Nissan took active steps to omit the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the class vehicles with the defective transmissions. The details of Nissan's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of the Plaintiffs and Class and Subclass Members. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Nissan wrongfully omitted its deceitful acts described above. Should it be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## FIRST CLAIM FOR RELIEF

(Breach of Express Warranty)

On behalf of the Class, or Alternatively, the California, Ohio, New York, Colorado, and Illinois Subclasses and their Named Representatives

116.    Plaintiffs, individually and on behalf of the Class or, in the alternative, for the California, Ohio, New York, Colorado, and Illinois Subclasses and their Named Representatives, hereby incorporate the allegations in paragraphs 1 through 115 as though fully set forth herein.

117.    Each class vehicle sold by Nissan included an express Warranty that covered, in part, the transmission and warranted that it would repair or replace any defects in materials and workmanship in the class vehicles.

118.    Nissan provided all purchasers and lessees of the class vehicles with a written Warranty that "begins on the date the vehicle is delivered to the first retail buyer or put into use, whichever is earlier." Under the Warranty's Powertrain Coverage, Nissan expressly warranted that the Warranty "covers any repairs needed to correct defects in materials or workmanship." The Warranty's Powertrain Coverage covers the vehicles for 60 months or 60,000 miles, whichever comes first. Nissan promised to cover listed powertrain components under its Warranty, including the transmission components such as the "[t]ransmission and [t]ransaxle [c]ase and all internal parts, torque converter and converter housing, automatic transmission control module, transfer case and all internal parts, seals and gaskets, clutch cover, A/T cooler, and electronic transmission controls.."

119.    Nissan maintains a full-time Quality Engineer for "Total Customer Satisfaction," at its headquarters near Nashville, Tennessee, whose responsibilities include analysis of field data (warranty, JD Power, IQS, etc.) to identify priority issues to be addressed, report quality results and action plans to executive management, perform static and dynamic evaluations of vehicle quality, and incorporate feedback from current model quality into the new product development process. The Quality Engineer reports to the Office of the Overseas Chief Quality Engineer (OCQE).

120.    In addition, Nissan maintains a full-time Quality Process Engineer at its headquarters near Nashville, Tennessee whose responsibilities are to analyze warranty data and reduce warranty claims and develop and present solutions to field concerns in formal reviews with executive management.

121.    Through its personnel, whose responsibilities include monitoring defects, analyzing warranty and field data, and reporting findings to executive management, as well as through its highly developed internal information and reporting systems, Defendant has been made aware of the

defective CVT for years, but failed to notify Plaintiffs and members of the proposed Class and Subclasses during the warranty period and failed to repair the defect free of charge.

122.    Plaintiffs also gave notice to Nissan of their vehicles' defect through its dealer and agent and through its customer service division, and gave Nissan a chance to repair the defect under the express warranty. Nissan was also on notice of the defect by virtue of the NHTSA and other complaints set forth herein, as well as its internal investigation of the defect in class vehicles as early as 2013.

123.    Nissan breached its warranties by offering for sale and selling defective vehicles that were by construction defective and unsafe and refusing to recognize or permanently repair the defect, thereby subjecting the occupants of the class vehicles purchased or leased to damages and risks of loss and injury.

124.    Nissan's warranty to repair the class vehicles fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs, the Class, and the Subclasses whole because Nissan has been unable to repair the defect or has refused to replace the transmission with a different, functional transmission. As Nissan's Technical Service Bulletins demonstrate, Nissan is incapable of repairing the defect, despite repeated attempts to do so.

125.    Accordingly, Plaintiffs, the Class, and the Subclasses are not limited to the limited warranty of "repair" and Plaintiffs, the Class, and the Subclasses seek all remedies allowed by law.

126.    Plaintiffs and the Class or, in the alternative, the California, Ohio, New York, Colorado, and Illinois Subclasses seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, restitution, the repair or replacement of all class vehicles, the refund of money paid to own or lease all class, and appropriate equitable relief including injunctive relief, a declaratory judgment, and a court order enjoining Nissan's wrongful acts and practices, and any other relief to which Plaintiffs and the Class or the California, Ohio, New York, Colorado, and Illinois Subclasses may be entitled.

## SECOND CLAIM FOR RELIEF

(Breach of Implied Warranty of Merchantability)

On behalf of the Class or, Alternatively, the California, Ohio, New York, Colorado, and Illinois

1    Subclasses and their Named Representatives

2    127.    Plaintiffs, individually, and for the Class or, in the alternative, the California, Ohio,

3    New York, Colorado, and Illinois Subclasses and their Named Representatives, hereby incorporate the

4    allegations in paragraphs1 through 115 as though fully set forth herein.

5    128.    Nissan impliedly warranted that the class vehicles, which it designed, manufactured,

6    sold, or leased to Plaintiffs and the Class or Members of the California, Ohio, New York, Colorado,

7    and Illinois Subclasses, were merchantable, fit and safe for their ordinary use, not otherwise injurious

8    to consumers, and equipped with adequate safety warnings.

9    129.    Because the class vehicles are equipped with a defective transmission system, the

10   vehicles purchased or leased and used by Plaintiffs, the Class, and Subclass Members are unsafe, unfit

11   for their ordinary use when sold, and not merchantable. Nissan breached the implied warranty of

12   merchantability by selling or leasing class vehicles to Plaintiffs, the Class, and Members of the

13   California, Ohio, New York, Colorado, and Illinois Subclasses.

14   130.    Plaintiffs and the Class or, alternatively, the California, Ohio, New York, Colorado, and

15   Illinois Subclasses seek full compensatory damages allowable by law, attorneys' fees, costs, punitive

16   damages, restitution, the repair or replacement of all class vehicles, the refund of money paid to own

17   or lease all class vehicles, and appropriate equitable relief including injunctive relief, a declaratory

18   judgment, and a court order enjoining Nissan's wrongful acts and practices and any other relief to

19   which Plaintiffs and the Class or, alternatively, the California, Ohio, New York, Colorado, and Illinois

20   Subclasses may be entitled.

21   **THIRD CLAIM FOR RELIEF**

22   (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

23   On behalf of the Class or, Alternatively, On Behalf of the California, Ohio, New York, Colorado, and

24   Illinois Subclasses and their Named Representatives

25   131.    Plaintiffs, individually and for the Class or, in the alternative, the California, Ohio, New

26   York, Colorado, and Illinois Subclasses and their Named Representatives, hereby incorporate the

27   allegations in paragraphs 1 through 115 as though fully set forth herein.

28   132.    Plaintiffs, the Class, and Subclass Members are "consumers" within the meaning of the

1  Magnuson-Moss Act, 15 U.S.C. § 2301(3).

2       133.   Nissan is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act,

3  15 U.S.C. § 2301(4) and (5).

4       134.   The class vehicles at issue are "consumer products" within the meaning of the

5  Magnuson-Moss Act, 15 U.S.C. § 2301(6).

6       135.   For each class vehicle, Nissan issued an express Warranty that covered the vehicle,

7  including but not limited to the transmission, and which warranted that Nissan would repair or replace

8  any part that is defective in material or workmanship under normal use.

9       136.   Nissan breached its express warranties by offering for sale and selling defective

10  vehicles that were, by construction, defective and unsafe, and failing to repair said vehicles, thereby

11  subjecting the occupants of the class vehicles purchased or leased to damages and risks of loss and

12  injury.

13       137.   Nissan's written warranties relate to the future performance of its vehicles because it

14  promised that the drivetrain of the class vehicles would perform adequately for a specified period of

15  time or mileage, whichever came first.

16       138.   Nissan has breached and continues to breach its written and implied warranties of

17  future performance, thereby damaging Plaintiffs and similarly situated Class and Subclass Members,

18  because the class vehicles fail to perform as represented due to an undisclosed transmission defect.

19  Nissan fails to fully cover or pay for necessary inspections, repairs and/or vehicle replacements for

20  Plaintiffs, the Class, and the Subclasses.

21       139.   Plaintiffs, the Class, and Subclass Members, and the public will suffer irreparable harm

22  if Nissan is not ordered to properly repair all of the class vehicles immediately, offer rescission to the

23  Class or Subclasses by repurchasing their class vehicles for their full cost, reimburse the lessees of the

24  class vehicles the monies they have paid toward their leases, recall all defective vehicles that are

25  equipped with the defective transmissions, and cease and desist from marketing, advertising, selling,

26  and leasing the class vehicles.

27       140.   Nissan is under a continuing duty to inform its customers of the nature and existence of

28  potential defects in the class vehicles.

141.    Such irreparable harm includes, but is not limited to, likely injuries and crashes as a result of the defects in the class vehicles.

142.    Plaintiffs and the Class or, in the alternative, the Subclasses seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, restitution, the repair or replacement of all class vehicles, the refund of money paid to own or lease all class vehicles, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Nissan's wrongful acts and practices, and any other relief to which Plaintiffs and the Class or, alternatively, the California, Ohio, New York, Colorado, and Illinois Subclasses may be entitled.

**FOURTH CLAIM FOR RELIEF**

(Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)

On Behalf of Plaintiff Falk the California Subclass

143.    Plaintiff Falk, individually and for the California Subclass, hereby incorporates the allegations in paragraphs 1 through 115 as though fully set forth herein.

144.    Plaintiff Falk, the Class, and Subclass Members are "buyers" within the meaning of the Song-Beverly Consumer Warranty Act, California Civil Code § 1791(a).

145.    Nissan is a "manufacturer" within the meaning of the Song-Beverly Consumer Warranty Act, California Civil Code § 1791(j).

146.    The class vehicles at issue are "consumer goods" within the meaning of the Song-Beverly Consumer Warranty Act, California Civil Code § 1791(a).

147.    Nissan's Warranty is an "express warrant[y]" within the meaning of Song-Beverly Consumer Warranty Act, California Civil Code § 1791.2.

148.    At all relevant times, Nissan manufactured, distributed, warranted, and/or sold the class vehicles. Nissan knew or had reason to know of the specific use for which the class vehicles were purchased or leased.

149.    Nissan provided an implied warranty to Plaintiff Falk and California Subclass Members, which warranted that the class vehicles, including the components parts, are merchantable and fit for the ordinary purposes for which they were sold. However, *inter alia*, the transmissions in

the class vehicles suffer from an inherent defect at the time of sale and, thereafter, are not fit for their ordinary purpose of providing reasonably safe and reliable transportation.

150.    Nissan impliedly warranted that the class vehicles are of merchantable quality and fit for such use. The implied warranty includes, among other things: (i) a warranty that the class vehicles manufactured, supplied, distributed, and/or sold by Nissan are safe and reliable for providing transportation; and (ii) a warranty that the class vehicles are fit for their intended use.

151.    Contrary to the applicable implied warranties, the class vehicles, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff Falk and California Subclass Members with reliable, durable, and safe transportation. Instead, the transmissions in class vehicles are defective and suffer from transmission failures that compromise the reliability, durability, and safety of class vehicles.

152.    As a result of Nissan's breach of the applicable implied warranties, owners and/or lessees of the class vehicles have suffered an ascertainable loss of money, property, and/or value of their class vehicles. Additionally, as a result of the transmission defect, Plaintiff Falk and California Subclass Members were harmed and suffered actual damages in that the class vehicles' transmission are substantially certain to fail or have failed before their expected useful life has run. The transmission failures create a high risk of accidents, injuries, and even death.

153.    Nissan's actions, as complained of herein, breached the implied warranty that the class vehicles were of merchantable quality and fit for such use, in violation of California Civil Code §§ 1792 and 1791.1, *et seq*.

154.    Plaintiff Falk and the California Subclass seek full compensatory damages allowable by law, attorneys' fees, costs, the repair or replacement of all class vehicles the refund of money paid to own or lease all class vehicles, and any other relief to which Plaintiffs and the California Subclass may be entitled.

**FIFTH CLAIM FOR RELIEF**

(Violation of California's Consumer Legal Remedies Act,

California Civil Code §§ 175, *et seq*.)

On Behalf of Plaintiff Falk and the California Subclass

155.   Plaintiff Falk, individually and on behalf of the California Subclass, hereby incorporates the allegations in paragraphs 1 through 115 as though fully set forth herein.

156.   Defendant Nissan North America, Inc. is a "person" as defined by California Civil Code § l761(c).

157.   Plaintiff Falk and California Subclass Members are "consumers" within the meaning of California Civil Code §1761(d) because they purchased their class vehicles primarily for personal, family, or household use.

158.   By failing to disclose and concealing the defective nature of the transmissions from Plaintiff Falk and prospective California Subclass Members, Nissan violated California Civil Code § 1770(a), as they represented that the class vehicles and their transmissions had characteristics and benefits that they do not have and represented that the class vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

159.   Nissan's unfair and deceptive acts or practices occurred repeatedly in Nissan's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

160.   Nissan knew that the class vehicles and their transmissions suffered from an inherent defect, were defectively manufactured or contained defective materials, and were not suitable for their intended use and as a result of the defect known to Nissan as alleged herein, created an unreasonable safety risk for class members.

161.   As a result of their reliance on Nissan's omissions and/or misrepresentations, owners and/or lessees of the class vehicles suffered an ascertainable loss of money, property, and/or value of their class vehicles. Additionally, as a result of the transmission defect, Plaintiff Falk and California Subclass Members were harmed and suffered actual damages in that the class vehicles' transmission or transmission components are substantially certain to fail or have failed before their expected useful life has run.

162.   Nissan had a duty to Plaintiff Falk and California Subclass Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

a.   Nissan was in a superior position to know the true state of facts about the safety defect in the class vehicles' transmissions;

b.   Plaintiff Falk and California Subclass Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

c.   Nissan knew that Plaintiff Falk and California Subclass Members could not reasonably have been expected to learn of or discover the safety defect.

163.    In failing to disclose the defective nature of the transmissions, Nissan knowingly and intentionally omitted material facts and breached its duty not to do so.

164.    The facts about the transmission defect that Nissan concealed from or failed to disclose to Plaintiff Falk and California Subclass Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the class vehicles or pay less for them. Had Plaintiff Falk and California Subclass Members known that the class vehicles' transmissions were defective, they would not have purchased or leased the class vehicles or would have paid less for them.

165.    Plaintiff Falk and California Subclass Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit the aforementioned transmission failures.

166.    As a result of Nissan's conduct, Plaintiff Falk and California Subclass Members were harmed and suffered actual damages in that the class vehicles experienced and may continue to experience the aforementioned transmission failures. As a direct and proximate result of Nissan's unfair or deceptive acts or practices, Plaintiff Falk and California Subclass Members suffered and will continue to suffer actual damages.

167.    Plaintiffs sent Nissan a letter on August 21, 2017 by United States Postal Service Certified Mail and FedEx Priority Overnight that provided notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) sent. If, within 30 days of its receipt of that notice, Nissan fails to provide appropriate relief for their violations of the CLRA, Plaintiffs will amend this Complaint to seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief that they seek now.

168.    Plaintiff Falk and California Subclass Members are entitled to the injunctive and equitable relief that they seek, along with any other remedies available by law.

### SIXTH CLAIM FOR RELIEF

(Violation of California's Business & Professions Code § 17000, *et seq.*)

On Behalf of Plaintiff Falk and the California Subclass

169.    Plaintiff Falk, individually and on behalf of the California Subclass, hereby incorporates  the allegations in paragraphs 1 through 115 as though fully set forth herein.

170.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

171.    Reasonable consumers, such as Plaintiff Falk and California Subclass Members, do not expect their transmissions to exhibit problems such as shaking, juddering, shuddering, jerking, delayed acceleration, and, eventually, complete transmission failure.

172.    Nissan knew the class vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use and created an unreasonable safety risk.

173.    In failing to disclose the defects with the transmission, Nissan knowingly and intentionally concealed material facts and breached its duty not to do so.

174.    By their conduct, Nissan has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

175.    Nissan had a duty to Plaintiff Falk and California Subclass Members to disclose the defective nature of the class vehicles and their transmissions because:

a.    Nissan was in a superior position to know the true facts about the safety defect in the class vehicles' transmissions;

b.    Nissan made partial disclosures about the quality of the class vehicles without revealing the defective nature of the class vehicles and their transmissions; and

c.    Nissan actively concealed the defective nature of the class vehicles and their transmissions from Plaintiff Falk and the California Subclass.

176.    The facts regarding the transmission defect that Nissan concealed from or failed to disclose to Plaintiff Falk and California Subclass are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease class vehicles. Had Plaintiff Falk and California Subclass Members known that the class vehicles' transmissions were defective and posed a safety hazard, then Plaintiff Falk and California Subclass Members would not have purchased or leased class vehicles equipped with transmissions, or would have paid less for them.

177.    Nissan continues to conceal the defective nature of the class vehicles and their transmissions even after Class Members began to report problems.

178.    Nissan's conduct was and is likely to deceive consumers. Nissan's unfair or deceptive acts or practices occurred repeatedly in Nissan's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

179.    Nissan's acts, conduct and practices were unlawful, in that they constituted:

    a.   Violations of the California Consumer Legal Remedies Act;

    b.   Violations of the Song-Beverly Consumer Warranty Act; and

    c.   Violations of the express warranty provisions of California Commercial Code section 2313.

180.    As a result of their reliance on Nissan's omissions and/or misrepresentations, owners and/or lessees of the class vehicles suffered an ascertainable loss of money, property, and/or value of their class vehicles. Additionally, as a result of the transmission defect, Plaintiff Falk and California Subclass Members were harmed and suffered actual damages in that the class vehicles' transmission and/or transmission components are substantially certain to fail before their expected useful life has run.

181.    As a direct and proximate result of Nissan's unfair and deceptive practices, Plaintiff Falk and the California Subclass have suffered and will continue to suffer actual damages.

182.    Nissan has been unjustly enriched and should be required to make restitution to Plaintiff Falk and the California Subclass pursuant to §§ 17203 and 17204 of the Business & Professions Code.

183.    Plaintiff Falk and the California Subclass seek all remedies available pursuant to

§17070, *et seq*. of the Business & Professions Code, including full compensatory damages allowable by law, attorneys' fees, costs, the repair or replacement of all class vehicles the refund of money paid to own or lease all class vehicles, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Nissan's wrongful acts and practices, and any other relief to which Plaintiff and the California Subclass may be entitled.

**SEVENTH CLAIM FOR RELIEF**

(Ohio Consumer Sales Practices Act,

Ohio Rev. Code. § 1345.01, *et seq*.)

On Behalf of Plaintiff Jayavelu and the Ohio Subclass

184.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 115 as though set forth fully herein, and further states:

185.    Nissan is a "supplier," as defined by Ohio Rev. Code § 1345.01.

186.    Plaintiff Jayavelu and the Ohio Subclass Members are "consumers," as defined by Ohio Rev. Code § 1345.01.

187.    As a result of placing a defective product into the stream of commerce, Nissan has breached its implied warranty in tort, which is an unfair and deceptive act as defined in Ohio Rev. Code § 1345.09(B).

188.    Nissan has committed unfair and deceptive acts, in violation of Ohio's Consumer Sales Practices Act, by knowingly placing into the stream of commerce Class Vehicles equipped with defective transmissions that result in, among other problems, sudden and unexpected failure of the vehicles' power.

189.    Moreover, Nissan has committed unfair, deceptive, and unconscionable acts by knowingly concealing the defect in the class vehicles, failing to inform Plaintiff Jayavelu and the other Ohio Subclass Members of this defect, and in the following ways:

        a. At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the class vehicles by failing to disclose to Plaintiff Jayavelu and Ohio Subclass Members the known defects in the transmissions and the known risks associated therewith.

b.  Thereafter, Defendant failed to disclose the defects to Plaintiff Jayavelu and the Ohio Subclass Members, either through warnings or recall notices, and/or actively concealed from them the fact that the class vehicles' transmissions were defective, even though Nissan knew of such defects: (1) at the time of manufacturing, during pre-market testing; (2) at the point where NHTSA began to record complaints about the defect in October 2012; or, at the latest, (3) from its own Technical Service Bulletins dating back to January 2013.

c.  Defendant forced Plaintiff Jayavelu and Ohio Subclass Members to expend sums of money at its dealerships and elsewhere to repair and/or replace the defective transmissions on the class vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

d.  Additionally, Defendant, in administering the Warranty, engaged in materially misleading deceptive acts and practices by replacing failing transmissions with equally defective units and denying the existence of and refusing to repair the widely known problems with the transmissions without a particular code appearing in the vehicles' computers.

e.  Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the class vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

196.  The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the true defective nature of the transmissions.

197.  By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts in breach of its duty not to do so.

198.    Members of the public were deceived by Defendant's failure to disclose and could not discover the defect themselves before suffering their injuries.

199.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that acts and omissions similar to kinds alleged in this Complaint, including, but not limited to, the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act.   These cases include, but are not limited to, the following:

      a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

      b.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

      c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

      d.   *Bellinger v. HewJayavelu-Packard Co.,* No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

      e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

      f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

      g.   *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

      h.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

      i.   *Brinkman v. Mazda Motor of America, Inc.,* (OPIF #10001427);

      j.   *Khouri v. Don Lewis*, (OPIF #100001995);

      k.   *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

      l.   *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and,

      m.   *Brown v. Spears*, (OPIF #10000403).

200.    Nissan committed these and other unfair and deceptive acts in connection with the marketing and sale of the class vehicles.

201.    As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices, Plaintiff Jayavelu and Ohio Subclass Members have been damaged because they: purchased class vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for transmission diagnoses, repairs, and replacements, towing, and/or

1   rental cars, and are left with class vehicles of diminished value and utility because of the defect.

2   Meanwhile, Nissan has sold more class vehicles than it otherwise could and charged inflated prices for

3   class vehicles, thereby unjustly enriching itself.

4        202.   Plaintiff Jayavelu and Ohio Subclass Members seek restitution of the substantial sums of

5   money they expended, including to replace their Nissan Sentras' defective transmissions, which

6   Defendant knew about prior to the sale of the class vehicles.

7        203.   Plaintiff Jayavelu and the Ohio Subclass also seek appropriate equitable relief, including

8   an order requiring Nissan to adequately disclose and remediate the transmission defect and enjoining

9   Nissan from incorporating the defective transmissions into its vehicles in the future.

10       204.   Nissan is liable to Plaintiff Jayavelu and the other Ohio Subclass Members for

11   compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code §

12   1345.09.

13                                 **EIGHTH CLAIM FOR RELIEF**

14                           (Deceptive Acts and Practices Unlawful,

15                         N.Y. Gen. Bus. Law § 349, *et seq*.)

16                 On Behalf of Plaintiff Cruz and the New York Subclass

17        205.   Plaintiff Cruz hereby incorporates by reference the allegations in paragraphs 1 through

18   115 as though set forth fully herein.

19        206.   Plaintiff Cruz asserts this cause of action on behalf of herself and the New York

20   Subclass Members.

21        207.   Defendant sold and/or leased the Class Vehicles knowingly concealing that they

22   contained the defects alleged.

23        208.   Defendant's acts are and were deceptive acts or practices which are and/or were, likely

24   to mislead a reasonable consumer purchasing the class vehicles.  Nissan's aforementioned deceptive

25   acts and practices are material, in part, because they concern an essential facet of the class vehicles'

26   functionality and safety. The sale and distribution of the class vehicles in New York was a consumer-

27   oriented act and thereby falls under the New York deceptive acts and practices statute, General

28   Business Law Section 349.

209.    Defendant's practices, acts, policies and course of conduct violated New York's General Business Law Section 349 Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 (McKinney), *et seq.*, in that:

    a.  At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the class vehicles by failing to disclose to Plaintiff Cruz and New York Subclass Members the known defects in the transmissions and the known risks associated therewith.

    b.  Thereafter, Defendant failed to disclose the defects to Plaintiff Cruz and the New York Subclass Members, either through warnings or recall notices, and/or actively concealed from them the fact that the class vehicles' transmissions were defective, despite the fact that the company knew of such defects: (1) at the time of manufacturing, during pre-market testing; (2) at the point where NHTSA began to record complaints about the defect in October 2012; or, at the latest, (3) from its own Technical Service Bulletins dating back to January 2013.

    c.  Defendant forced Plaintiff Cruz and the New York Subclass Members to expend sums of money at its dealerships to repair and/or replace the defective transmissions, despite the fact that Defendant had prior knowledge of the defects at the time of purchase.

    d.  Additionally, Defendant, in administering the Warranty, engaged in materially misleading deceptive acts and practices by replacing failing transmissions with equally defective units and denying the existence of and refusing to repair the widely known problems with the transmissions without a particular code appearing in the vehicles' computers.

    e.  Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the class vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended,

1      represented, and warranted and that the above described defects would cause
2      purchasers to incur significant out-of-pocket costs and expenses.

3      210.    The aforementioned conduct is and was deceptive and false and constitutes an
4 unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing,
5 intentional, and material omissions, concealed the true, defective nature of the transmissions in Nissan
6 Sentras.

7      211.    By making these misrepresentations of fact and/or material omissions to prospective
8 customers while knowing such representations to be false, Defendant has misrepresented and/or
9 knowingly and intentionally concealed material facts and breached its duty not to do so.

10      212.    Defendant's misrepresentations of fact and/or material omissions caused injury and
11 actual damages to Plaintiff and the New York Class Members.

12      213.    Members of the public were deceived by Defendant's failure to disclose and could not
13 discover the defect themselves before suffering their injuries. As a direct and proximate result of these
14 unconscionable, unfair, and deceptive acts or practices, Plaintiff Cruz and the New York Class
15 Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent
16 permitted by law, including class action rules, in an amount to be proven at trial.

17      214.    Plaintiff Cruz and New York Subclass Members seek restitution of the substantial sums
18 of money they expended to replace their Nissan Sentras' defective transmissions, which Defendant
19 knew about prior to the sale of the class vehicles and further seek statutory damages or actual damages,
20 whichever is greater for their consumer-related injuries..

21      215.    Plaintiff Cruz and New York Subclass Members also seek appropriate equitable relief,
22 including an order requiring Nissan to adequately disclose and remediate the transmission defect and an
23 order enjoining Nissan from incorporating the defective transmissions into its vehicles in the future.

24                              **NINTH CLAIM FOR RELIEF**

25                             (Colorado's Consumer Protection Act,

26                             Col. Rev. Stat. § 6-1-101, *et seq.*)

27              On Behalf of Plaintiff Trotter and the Colorado Subclass

28

216.    Plaintiff Trotter, individually and for the Colorado Subclass, hereby incorporates the allegations in paragraphs 1 through 115 as though fully set forth herein.

217.    Nissan is a "person," as defined by § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA").

218.    Plaintiff Trotter and the Colorado Subclass are "consumers," as defined by the Col. Rev. Stat. § 6-1-113(1)(a), who purchased or leased one or more class vehicles.

219.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Nissan engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the class vehicles that had the capacity or tendency to deceive Plaintiff Trotter and Colorado Subclass Members; (2) representing that the class vehicles are of a particular standard, quality, and grade even though Nissan knew or should have known they are not; (3) advertising the class vehicles and/or the defective CVT installed in them with the intent not to sell or lease them as advertised; and (4) failing to disclose material information concerning the class vehicles that was known to Nissan at the time of advertisement, sale or lease with the intent to induce Plaintiff Trotter and the Colorado Subclass Members to purchase, lease or retain the class vehicles.

220.    In the course of its business, Nissan failed to disclose and actively concealed the dangers and risks posed by the class vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Nissan also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or lease of the class vehicles.

221.    Nissan's actions as set forth above occurred in the conduct of trade or commerce. Nissan's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff Trotter and the Colorado Subclass, about the true safety and reliability of the class vehicles, the quality of Nissan's brands, and the true value of the class vehicles.

222.     Nissan intentionally and knowingly misrepresented material facts regarding the class vehicles with intent to mislead Plaintiff Trotter and the Colorado Subclass.

223.     Nissan knew or should have known that its conduct violated the Colorado CPA.

224.     Nissan owed Plaintiff Trotter and the Colorado Subclass a duty to disclose the true safety and reliability of the class vehicles because Nissan:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from Plaintiff Trotter and the Colorado Subclass; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Trotter and the Colorado Subclass that contradicted these representations.

225.     In light of the class vehicles' defect, and the stigma attached to class vehicles due to the defect and Nissan's failure to disclose the same, the class vehicles are now worth significantly less than they would be otherwise. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a manufacturer that consumers learn makes unsafe vehicles and conceals defects rather than promptly remedying them.

226.     Plaintiff Trotter and the Colorado Subclass suffered ascertainable loss caused by Nissan's misrepresentations and its failure to disclose material information. Had they been aware of the class vehicles' defect, Plaintiff Trotter and the Colorado Subclass would have paid less for their class vehicles or would not have purchased or leased them at all. Plaintiff Trotter and the Colorado Subclass did not receive the benefit of their bargain as a result of Nissan's misconduct.

227.     Plaintiff Trotter and the Colorado Subclass risk irreparable injury as a result of Nissan's acts and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiff Trotter and the Colorado Subclass, and the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

228.     As a direct and proximate result of Nissan's violations of the Colorado CPA, Plaintiff Trotter and the Colorado Subclass have suffered injury-in-fact and/or actual damage.

229.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Trotter individually and on behalf of the Colorado Subclass, seeks monetary relief against NISSAN measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff Trotter and each Member of the Colorado Subclass.

230.    Plaintiff Trotter also seeks an order enjoining Nissan's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**TENTH CLAIM FOR RELIEF**

(Illinois Uniform Deceptive Trade Practices Act

815 ILCA 510/1, *et seq.*)

On Behalf of Plaintiff Macri and the Illinois Subclass

231.    Plaintiff Macri, individually and for the Illinois Subclass, hereby incorporates the allegations in paragraphs 1 through 115 as though fully set forth herein.

232.    Plaintiff Macri and Illinois Subclass Members are "person[s,]" as defined by 815 ILCS 510/1.

233.    Defendant Nissan North America, Inc. is a "person" as defined by 815 ILCS 510/1.

234.    By representing that the class vehicles had characteristics and benefits that they do not have and represented that the class vehicles and their transmissions were of a particular standard, quality, or grade when they were of another, Nissan violated 815 ILCS 510/1(a)(5) & (a)(7).

235.    Nissan misrepresented that the class vehicles were free from defects in their transmissions.

236.    Nissan knew of the defects in the transmissions of the class vehicles, including in Plaintiff Macri's 2013 Sentra, at the time the vehicles were purchased.

237.    Nissan concealed the defects in the class vehicles from Plaintiff Amanda Macri and other members of the Illinois Subclass.

238.   Had Plaintiff Macri and Illinois Subclass Members known that the class vehicles' transmissions were defective, they would not have purchased or leased the class vehicles or would have paid less for them.

239.   As a result of Nissan's conduct, Plaintiff Macri and Illinois Subclass Members were harmed and suffered actual damages in that the class vehicles experienced and may continue to experience the aforementioned transmission failures.

240.   As a direct and proximate result of Nissan's unfair or deceptive acts or practices, Plaintiff Macri and Illinois Subclass Members suffered and will continue to suffer actual damages.

241.   Plaintiff Macri and Illinois Subclass Members are entitled to injunctive relief, attorneys' fees and costs, and any other relief provided by law.

## ELEVENTH CLAIM FOR RELIEF

(Illinois' Consumer Fraud and Deceptive Business Practices Act

815 ILCS 505/1, *et seq.*)

On Behalf of Plaintiff Macri and the Illinois Subclass

242.   Plaintiff Macri, individually and for the Illinois Subclass, hereby incorporates the allegations in paragraphs 1 through 115 as though fully set forth herein.

243.   Plaintiff Macri and Illinois Subclass Members are "person[s,]" as defined by 815 ILCS 505/1(c).

244.   Defendant Nissan North America, Inc. is a "person" as defined by 815 ILCS 505/1(c).

245.   By offering the class vehicles for sale through its authorized dealers, selling the class vehicles, and distributing the class vehicles, Nissan engaged in "trade" and "commerce" as defined by 815 ILCS 505/1(f).

246.   By misrepresenting that the class vehicles did not contain a defect and that Nissan could repair the defect in parts covered under the Warranty, omitting the existence of a transmission defect in class vehicles at the time of purchase and when owners brought their vehicles in for repair due to the transmission failures, and failing to advise owners of class vehicles of the transmission defect post-purchase, Nissan engaged in unfair and deceptive practices in the conduct of trade or commerce in violation of 815 ILCS 505/2.

247.   Nissan knew of the defects in the transmissions of the class vehicles, including in Plaintiff Macri's 2013 Sentra, at the time the vehicles were purchased.

248.   Nissan intended for Plaintiff Macri and the Illinois Subclass to rely on its misrepresentations and omissions and purchase the class vehicles under the assumption that they were safe to operate and did not contain a defect in parts covered under the Warranty that Nissan could not fix.

249.   Had Plaintiff Macri and Illinois Subclass Members known that the class vehicles' transmissions were defective, they would not have purchased or leased the class vehicles or would have paid less for them.

250.   As a result of Nissan's conduct, Plaintiff Macri and Illinois Subclass Members were harmed and suffered actual damages in that the class vehicles experienced and may continue to experience the aforementioned transmission failures.

251.   As a direct and proximate result of Nissan's unfair or deceptive acts or practices, Plaintiff Macri and Illinois Subclass Members suffered and will continue to suffer actual damages.

252.   Plaintiff Macri and Illinois Subclass Members are entitled to actual damages, punitive damages, injunctive relief, attorneys' fees and costs, and any other relief provided by law.

## TWELFTH CLAIM FOR RELIEF

(Equitable Injunctive and Declaratory Relief)

On Behalf of the Class or, Alternatively, on Behalf of the California, Ohio, New York, Colorado and Illinois Subclasses and Their Named Representatives

253.   Plaintiffs, individually and on behalf of the Class or, in the alternative, the California, Ohio, New York, Colorado and Illinois Subclasses hereby incorporate the allegations in paragraphs 1 through 115 as though fully set forth herein.

254.   Nissan is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles it sells.

255.   Nissan acted uniformly towards Plaintiffs, the Class, and Members of the California, Ohio, New York, Colorado and Illinois Subclasses by refusing the adequately warn about the dangers of the transmission defect or offer a permanent repair of the defect.

256.    Plaintiffs, the Class, Members of the California, Ohio, New York, Colorado and Illinois Subclasses, and the public will suffer irreparable harm if Nissan is not ordered to properly repair all of the class vehicles immediately, offer rescission to the California, Ohio, New York, Colorado and Illinois Subclasses, by repurchasing their class vehicles for their full cost, reimbursing the lessees of the class vehicles the monies they have paid toward their leases, recalling all defective vehicles that are equipped with the defective transmissions, and ceasing and desisting from marketing, advertising, selling, and leasing the class vehicles.

257.    Such irreparable harm includes, but is not limited to, likely injuries as a result of the transmission defects to the class vehicles.

258.    Plaintiffs and the Class or, alternatively, the California, Ohio, New York, Colorado and Illinois Subclasses seek appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Nissan's wrongful acts and practices, the repair or replacement of all class vehicles, the refund of money paid to own or lease all class vehicles, and any other relief to which Plaintiffs and the Class or, alternatively, the California, Ohio, New York, Colorado and Illinois Subclasses may be entitled.

## THIRTEENTH CLAIM FOR RELIEF

(Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* and Fed. R. Civ. P. 57)

On behalf of the Class or, Alternatively, on Behalf of the California, Ohio, New York, Colorado and Illinois Subclasses and Their Named Representatives

259.    Plaintiffs Falk, Jayavelu, Cruz, Trotter, and Macri, individually and for the Class or, alternatively, the California, Ohio, New York, Colorado and Illinois Subclasses, hereby incorporate the allegations in paragraphs 1 through 115 as though fully set forth herein.

260.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

261.    There is an actual controversy between Nissan and Plaintiffs concerning whether the class vehicles' transmission defect creates an unreasonable safety hazard. Pursuant to 28 U.S.C. § 2201,

1  the Court may "declare the rights and legal relations of any interested party seeking such declaration,

2  whether or not further relief is or could be sought."

3      262.    Despite long knowing the nature of the class vehicles' defect and its likelihood of

4  placing Plaintiffs, the Class, California, Ohio, New York, Colorado and Illinois Subclasses, and the

5  public at risk of grave injury, Nissan refuses to publicly acknowledge that the class vehicles contain a

6  dangerous defect. Instead, Nissan has unsuccessfully attempted to remediate the defect without

7  advising its consumers and other members of the public of the defect. Nissan has uniformly refused to

8  permanently repair the defect and, upon information and belief, does not always cover the defect under

9  the warranty.

10     263.    Accordingly, based on Nissan's failure to act, Plaintiffs seek a declaration that the class

11 vehicles are defective, as alleged herein, covered under the Warranty, and that the Warranty fails of its

12 essential purpose because Nissan cannot repair or replace the defective transmissions. The defective

13 nature of the class vehicles is material and requires disclosure to all persons who own them.

14     264.    The declaratory relief requested herein will generate common answers that will settle the

15 controversy related to the alleged defective nature of the class vehicles and the reasons for their

16 repeated failure. There is an economy to resolving these issues as they have the potential to eliminate

17 the need for continued and repeated litigation.

18                          **FOURTEENTH CLAIM FOR RELIEF**

19                                   (Unjust Enrichment)

20     On behalf of the Class or, Alternatively, on Behalf of the California, Ohio, New York, Colorado and

21                       Illinois Subclasses and Their Named Representatives.

22     265.    In the alternative, Plaintiffs Falk, Jayavelu, Cruz, Trotter, and Macri, individually and

23 for the Class or, alternatively, the Pennsylvania, California, New Jersey, and Florida Subclasses, hereby

24 incorporate the allegations in paragraphs 1 through 115 as though fully set forth herein.

25     266.    Nissan knew or should have known that Plaintiffs, the Class, and the California, Ohio,

26 New York, Colorado and Illinois Subclasses paid for the class vehicles with the expectation that they

27 would perform as represented.

28     267.    Plaintiffs, the Class, and the California, Ohio, New York, Colorado and Illinois

Subclasses conferred substantial benefits on Nissan by purchasing the defective class vehicles. Nissan knowingly and willingly accepted and enjoyed those benefits.

268.    Nissan's retention of these benefits is inequitable.

269.    As a direct and proximate cause of Nissan's unjust enrichment, Plaintiffs, the Class or, in the alternative the California, Ohio, New York, Colorado and Illinois Subclasses, are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Nissan as follows:

A.    For an order certifying the Class and/or Subclasses, appointing Plaintiffs as representatives of the Class and each Subclass, and appointing the law firms representing Plaintiffs as counsel for the Class;

B.    For a declaration that the transmissions in class vehicles are defective, the remedial work necessary to correct the defective transmissions is covered by the Warranty, and the Warranty fails of its essential purpose;

C.    For compensatory damages and/or restitution or refund of all funds acquired by Nissan from Plaintiffs as a result of Nissan's unlawful, unfair, deceptive and unconscionable practices described herein and in the consumer protection statutes of California, Ohio, New York, Colorado and Illinois, including actual and/or statutory and/or punitive damages and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

D.    Trebling of damages suffered by the Class and/or appropriate Subclass;

E.    Payment of costs and expenses of suit herein incurred;

F.    Both pre-and post-judgment interest on any amounts awarded;

G.    Payment of reasonable attorneys' fees and expert fees;

H.    Punitive damages where available; and

I.    Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, the Class, and the California, Ohio, New York, Colorado and Illinois Subclasses

1 | hereby demand trial by jury of all issues triable by right.

2

3 | Dated:  August 22, 2017                    **BRONSTEIN, GEWIRTZ & GROSSMAN**

4 | By: /s/ Shimon Yiftach

5 | Shimon Yiftach (SBN 277387)
   | Peretz Bronstein*

6 | 1925 Century Park East, Suite 1990

7 | Los Angeles, CA 90067
   | T: (424) 322-0322

8 | F: (212) 697-7296
   | shimony@bgandg.com

9 | peretz@bgandg.com

10 | Gary Mason*

11 | Jennifer S. Goldstein** (SBN 310335)
    | WHITFIELD BRYSON & MASON, LLP

12 | 5101 Wisconsin Ave., NW
    | Suite 305

13 | Washington, D.C. 20016

14 | T: (202) 429-2290
    | F: (202) 429-2294

15 | gmason@wbmllp.com

16 | jgoldstein@wbmllp.com

17 | Lawrence Deutsch*

18 | Jeffrey Osterwise*
    | BERGER & MONTAGUE, P.C.

19 | 1622 Locust Street

20 | Philadelphia, PA 19103
    | T: (215) 875-3062

21 | F: (215) 875-4604

22 | ldeutsch@bm.net
    | josterwise@bm.net

23 | Nicholas A. Migliaccio*

24 | Jason S. Rathod*
    | MIGLIACCIO & RATHOD, LLP

25 | 412 H Street N.E., Ste. 302

26 | Washington, DC 20002
    | T: (202) 470-3520

27 | F:   (202 800-2730
    | nmigliaccio@classlawdc.com

28 | jrathod@classlawdc.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gary S. Graifman, Esq.*
Jay I. Brody, Esq.*
KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, New York 10977
T: (845) 356-2570
F: (845) 356-4335
ggraifman@kgglaw.com
jbrody@kgglaw.com

Daniel Calvert, Esq.*
Catherine S. Blackshear, Esq.*
PARKER WAICHMAN, LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
T: (239) 390-1000
F: (239) 390-0055
dcalvert@yourlawyer.com
cblackshear@yourlawyer.com

*Attorneys for Plaintiffs*

* Will seek *pro hac vice* admission

** Will seek admission to this Court

**Plaintiff Michelle Falk's CLRA Venue Declaration Pursuant to**

**Cal. Civ. Code § 1780(d)**

I, Michelle Falk, declare as follows:

1. I am a plaintiff in this action and a citizen of the State of California. I have personal knowledge of the facts stated herein and, if called as a witness, I could testify competently thereto.

2. This class action Complaint is filed in the proper place for trial because: (1) the Defendant is doing business in this District and (2) the transaction at issue, or a substantial portion thereof, took place in this District.

3. In July 2016, I purchased a Nissan Sentra in the City of Redwood, California, which is in this District.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date Executed: August 22, 2017

_____

Michelle Falk